Good morning, Your Honor. Good morning. Members of the panel, my name is Joe Sparks. I'm from Sparks Law Firm in Scottsdale. We represent the St. Carl's Apache Tribe and have done so for 35 years. The Chairman of the St. Carl's Apache Tribe, Mr. Winsler Nosy, is in the courtroom today. Welcome, Mr. Nosy. Your Honor, the Court is aware that this case is older than most of us, with my exception, and that it's been going on for 70 years. And we've been before the Court in that period of time about 14 times, and St. Carl's has been before the Court another half dozen on a related matter. This matter begins and ends with the Globe Equity Decree. It was a consent decree entered in 1934. And Article 13 of the decree enjoins, it's a permanent injunction, enjoins all the parties from using water in any manner, any means, any amount, any method, any rate other than expressly set forth in the decree. It is a permanent injunction from then to the beginning and from the end of time. The parties to this appeal on, you might say, the Appalachian side got together in a settlement of sorts to decide that among themselves they would agree not to enforce the decree. Those parties are thousands. As I put, as is placed in your briefing book, there's a picture, a map, of the location of the St. Carl's Reservation, which is nearly 2 million acres. And it's located between the upper Gila Valley and New Mexico, where this decree starts 10 miles inside of New Mexico. And the decree goes on the mainstream of the Gila all the way to the Salt River below Phoenix. You say they agreed not to enforce the decree against each other? Against each other. Only against each other. Only against each other. But, Your Honor, in doing so, that leaves one party against whom they have agreed to enforce the decree, and that's the St. Carl's Apache Tribe. And it leaves one party among those who are beneficiaries of the decree to enforce the decree. Mr. Stark? I'm sorry? Does the settlement agreement itself violate the globe equity decree? Now, the United States says, no, it's merely a forbearance agreement, and it just allows the status quo to continue. So, my question is, how does the settlement agreement itself violate the decree, if at all? The settlement agreement itself, the larger agreement that's called the Gila River Indian Settlement Agreement, has many exhibits and attachments. That agreement provides ways that the Gila River Indian community can use water in violation of the decree in Section 4, specifically. It can take water that bypasses Ashhurst-Hayden Dam and use it for other purposes, and it can use a subflow of the Gila on the reservation before it exits. In addition, it provides a safe haven on the various tributaries that enter the Gila River below Coolidge Dam, and allows those people who have no decreed rights, and whose claims are junior and inferior to the St. Charles Apache tribe, to take water, pursue it to a combination of safe harbor provisions and pumping provisions, in violation of the decree. That water would come to the Gila River Indian community under the decree, and under that decree, then, they have deprived the river of a certain amount of water, thousands of acre-feet of water, for instance, on the San Pedro and on the Santa Cruz, and allowed the tribe, the community itself, to take water which the decree does not permit the community to take. Now, that's the larger statutorily approved settlement, but that wasn't what the district court approved, correct? Are you saying that what the district court approved was just the UVFA agreement? Yes. But are you saying that, in effect, since that was a sine qua non of the larger settlement? Yes, and one of the objections filed by the St. Charles Apache tribe was that the court, the federal district court, should look at the other provisions and attachments and exhibits of the settlement agreement to see which of those affected the court's jurisdiction under the Globe Equity Decree, and many of those agreements and attachments and exhibits do, in fact, affect the jurisdiction, the race of the river, the mainstream of the Gila River, and its subplot. It's intricately intertwined simply because you have, at any given moment, a fixed amount of, basically, acre-feet that are running through the river? Yes, Your Honor. As a matter of fact, the United States and Arizona had stated to the U.S. Supreme Court since at least 1931 that the Gila River was totally appropriated, and this court in 1941, in two different cases, acknowledged that the Gila River was totally appropriated. The U.S. Supreme Court in Arizona versus California in 1964 said that the Gila River was totally appropriated, and therefore, to the extent that anyone takes the water of the Gila River or its subflow, as this court has recognized, it's part of the surface flow, those parties who are not decreed are not allowed to take that water by like the decree. So your point is it was a mistake on the part of the district court not to look at the entire situation and to carve out only that part that the court looked at? Over 4,000 pages, Your Honor, and yes, the answer is yes. The court should have looked to see what affected the subject matter jurisdiction of the decree, and the Apache tribe pointed out on multiple occasions, multiple instances with specificity, where the race of the river was actually affected by a different part of the settlement agreements that were before the court but which the court did not consider. We have a somewhat unusual procedural posture because we have the district court basically saying we have this new settlement, and therefore, I'm going to dismiss those parties from the pumping complaint and then leave the San Carlos tribe ready to go forward if it wants with the pumping complaint. So the question I have is if you filed in district court a motion for preliminary injunction against these other parties proceeding under their decree because it's a violation of the globe, under their settlement because it's a violation of the globe equity decree, do you believe that the district court would entertain that kind of a motion? Yes, Your Honor. In fact, expressly in the order approving the stipulation and the order denying the Apache tribe's objections, the court said that. The court said that it doesn't prohibit the tribe from going forward to enforce the decree. How long ago did the court say that? 2005. So what's been going on since then? Oh, pardon me. In 2007. But what's been going on since then? I mean, the court, you know it as well as I do, Judge Bolton said the door is wide open. None of this is going to entrench in any way against the tribe's rights. What's been going on for the last couple of years? I mean, somehow did you take advantage or were you prohibited from taking advantage of the court's offer? Yes, Your Honor, we have. And just a brief history of that, this entire proceeding was stayed in deference to the Colorado River Rule in 1970 and in 1980 and again in the 90s and until very late in 2000, the court, district court, deferring to the state court, lifted the stay. We then refiled the complaint and proceeded to there. So while this has been here, all of that has been proceeding apace? Yes. And were amended right up to the time of the decree. However, the race of the river is a subject matter jurisdiction which must be protected. It's all of it all of the time. And what has happened is as a result of this, those parties who are said to have claims to the Gila River outside of the decree, of which there's no water to appropriate according to all the courts, the San Carlos Apache tribe must proceed against those surface to pumpers and subflow pumpers in state court and separately. And that's not really part of this action. Well, actually, it is part of this action, Your Honor, because what has happened is it has inappropriately split the race of the decree into decreed and non-decreed sections when the entire race of the decree is, because of the decree, the exclusive jurisdiction of the federal district court. The United States said that below. Article 13 of the decree retains jurisdiction over the decree for enforcement purposes and for administration purposes. There's no other room for any other parties. Has there been a stay motion and has there been any kind of motion in those proceedings to stay them pending resolution of everything in the federal court? Yeah, we did that. We did that actually in both courts, and those stays were denied. And so this case – Those were not appealed? The denial of the stay? It is included in this appeal below coming forward in time to the notice of appeal here. Okay, but in terms of timing, the denial of the stay, did that occur coincident with the enforcement of the upper valley? No, not in the first instance, Your Honor. But in the second instance, denying the – overruling the objections of the tribe, it did, and that order is one of those appealed, one of the three orders appealed. And in the court below, in the state parallel proceeding, the tribe moved to stay those proceedings pending the resolution of that and the split jurisdiction issue before – of the race itself, the water or the river. So let's assume there's jurisdiction here, or at least jurisdiction to figure out what it is we have jurisdiction to do. In your ideal world, what would be the ruling from the Ninth Circuit? The ruling of the Ninth Circuit is that Article 13 of the decree prevails, and the parties and non-parties to decree cannot use water in any matter except as set forth in the decree in Article 5. And they can't agree among themselves to do otherwise. Is that another way of saying that, in your view, there's an improper effort to modify the decree? Yes, Your Honor. I think the only proper way to do that is under Rule 60b-5. It's a very difficult burden for them to carry. And just to clarify, the modification is not the UVFA, but the whole BRIC settlement agreement. Is that what you're saying? I'm saying the UFDA and the CUFA agreement with New Mexico. Hold on a second. CUFA? The Consumptive Use and Forbearance Agreement for New Mexico. Sections of Article – Well, wait, wait. Because when I had asked you whether the UVFA itself modified the decree, your response was – you didn't say exactly no, but you said it's the whole agreement, the whole BRIC settlement agreement. Does the UVFA itself modify the decree? Yes, it does, Your Honor. And how is that? Because the United States says, no, it's just a forbearance agreement. It just maintains – preserves the status quo. It doesn't modify the decree. Well, what it does is it takes the United States, who's also the trustee for the tribe, but you don't see him here today on our side of the room, agreeing that the decree as to all of those parties, including the United States for its own irrigation district downstream, won't enforce the decree. The provisions just won't be enforced as to pumping on non-decreed lands, on so-called hot lands. Special hot lands. Special hot lands. I mean, there's been all kinds of new considerations. Well, yes, and there's – and matters that have been long decided and defined in Western water law, and in this case, in this court, are redefined so as to be confusing, including what is the subflow of the river. I hear you saying that the entire settlement, including the UVFA, is trumped by Article 13. Is that what you're saying? Your Honor, I am saying that. I would like to stay, but I have 4.26 seconds, which I'd like to retain for rebuttal, if possible. We'll give you some time for rebuttal. I believe Judge Acuda had another question. I have one more question, which is the Arizona Supreme Court, when it made its ruling, said the subflow is easily identifiable. DWR, go out and map it. Some of the work has already been done. The briefs – the red briefs I saw all said, well, we don't really know where the subflow is, other than the brick brief said in the footnote, well, it's the impact zone is the subflow. Do we know where the subflow of the Gila River is now? And if not, why don't we have that information? Your Honor, I think that functionally we know, and that the impact zone is it. It is co-existent, co-extensive with the Younger Holocene Alluvium. Wells are where they produce water, and few of them are fewer than 80 feet deep, or greater than 80 feet deep. There's 1,700 of them, and they pump more than 220,000 acre-feet a year. So we know where the subflow zone is. And the parties among themselves agreed where wells would be located – wells which are already located and may be located in the future – where those wells will impact the flow of the river. That's the definition they put together in their agreement for what would, in fact, impact the flow of the Gila River. Does the settlement agreement, in your view, simply permit the Upper Valley Wells to continue pumping as they have, or does it actually fix some parameters for their pumping that are not in the abstract? Your Honor, I apologize for saying this, but the answer is yes. And it both permits Upper Valley pumpers to pump as they have, but in violation of the decree, and Article 5 of the decree, and Article 13, and Article 2 of the decree, and it allows those without decree rights to pump in violation of the decree also. The question that I had when I first read this – you know, I read Judge Bolton's statement over and over again, and the door is wide open to the tribe. None of this is in derogation in any way of any of the rights that you have. All you have to do is come in and throw the flag, and we'll take care of it. And my mind said to me, why is this ripe? Why don't we wait until we see what happens? Today, I'm finding out lots is happening behind the scenes. But in what respect is this ripe right now? Your Honor, it's ripe right now because what happened is that since 1935, this conduct has already been enjoyed. This conduct that they are agreeing that can continue among themselves has been enjoyed since 1935. And so it's ripe now. The court should not have allowed them to agree among themselves to violate Article 13, Sections 5, 8, and 2. And there was a stay requested and denied. A stay was requested and denied below, and an objection filed as to the form of the agreement, approval of the agreement itself, and the tribe's objections were overruled. So what do you contemplate would happen if we were to agree with you and say all of this is void, Article 13 and the rest, trump this, go back and start all over again with this whole problem? Where are you and what happens? What happens is, although it would be helpful, two-thirds of the room on that side would move over to this side, and they would be urging to this court and the federal district court that the pumping is unlawful, pumping by other nondecreed parties is unlawful, pumping from places other than described in the decree is unlawful. They would all be on this side of the room because it's harmful, it degrades the water, it depletes the water supply. They would all be on this side of the room, the Apache side of the room. That's where they were before they agreed among themselves not to enforce it. And then you'd slug it out in the district court. Slug it out in the district court, but, Your Honor, that slug out isn't nanotechnology science. It is, as does Arizona Supreme Court, capable of uncomplicated designation. And I apologize. Can I just ask you, though, I'm not sure. One of the difficulties we have is if we were to make this judgment that, in effect, this is a modification because the forbearance agreement by permitting the status quo as to decree, you know, those covered by the decree to go forward is somehow a violation of the decree, wouldn't we, in effect, foreclose an alternate finding in the district court by making that decision here? I just don't know that we – I don't know how we can make a determination that you're right on this point. You may well be right. But for us to make a ruling, one of my concerns is that we would have to accept your characterization that permitting the status quo to go forward is, in fact, a violation of the decree. Maybe you can help me out of this conundrum. Well, it's probably not helpful to suggest that this review is de novo. However, Your Honor, there was no question that this proceeding was proceeding – we've been attempting to adjudicate or to limit and stop the pumping the United States has since the 1970s. All of the San Carlos and Lower Valley parties have since the 1970s and 80s. And we – and the federal court deferred to the state court decision on what is subflow before it proceeded. So we – by ruling for the Apache Tribe, you actually would be preserving the status quo. What you would not be doing is blessing a wholesale agreement among all the parties that are not the San Carlos Apache Tribe of violating Article III, Article II, Article V, Article VIII, Article VI of the decree. That injunction has been in place. The court need not find that it's in – anyone's in violation of it. It need only find that an agreement to disregard all of those alleged violations, which the lower court, Judge Bolton, said are likely to be pumping illegally. All the court would be doing is saying that's not appropriate for everyone in a decree, except for one party, to agree that they among themselves would no longer enforce the decree. This is a matter in equity. How is that equitable? Can the court – can the parties just get together and decide that they're just going to violate a court order of this federal court or this court? They can't just get together and decide that. So that's the reason why ruling for the Apache Tribe will do nothing but allow us to adjudicate with propriety and dignity and in order those wells and those diversions of the Gila Decree that violate the decree. One last question. If you were not successful here, would anything preclude you from proceeding with that precise litigation in the district court? Yes. One of the things that would preclude us of protecting the tribe's decreed rights in district court is the fact that those parties that are using water who are not decreed, who have no decreed rights whatsoever, would be able to continue to do so in violation of the decree. However, the tribe, Apache Tribe, would have to go to state court to try to enjoin them from doing so. In other words, by splitting the jurisdiction of the court, not by the race of the jurisdiction, but by where the parties are in terms of their names or successors and interest in the decree itself. I don't understand that. And that's because they're not parties to this entire ballgame? No. Why can't you reel them into the federal court? Why must you go to the state court? Well, Your Honor, there's three part answers to that. One, in Arizona v. San Carlos, the United States Supreme Court, after this court, said that the tribes had to go, because of the McCarran Amendment, to the state court proceeding. And then the state court did not understand that the next thing that happened is when Judge Cunar lifted the stay in 2000 and told us, even though we had filed a complaint earlier in time, by 20 years, and tried unsuccessfully on many occasions to get the stay lifted, told us to file a new complaint and serve everyone. So we did serve everyone with a registered will, and anyone else we can find. These would include what you call non-decree users as well? Yes, Your Honor. And then the federal district court allowed us to proceed only against decreed owners. And so that left the non-decreed owners in limbo. What was the rationale for doing that? Your Honor, I do not know the answer, because we, in fact, expressly, by order of court, served them in person. Mr. Fine might tell you that we also served a dog whose name was a record for one of the wills there. Well, you know, Ruffy, or whatever his name was, was. Probably Marley, right? Yeah, yeah. But in any event, we served everybody. They were all served. They're still served, as far as we're concerned. However, we were not allowed to proceed. Then the state court decided that it had jurisdiction over everybody who claimed water out of the Yellow Mainstream who had no decree, and the federal district court ruled only as to those parties who are successors in interest named in the decree. So thus we split the race in many fractional ways, and it makes it nearly, at least impracticable of enforcement. It will take decades to try to go back and forth among those. And some of those people are exactly the same people. Decree lands held by a successor, and non-decree lands held by a successor. So here we are, jockeying among the various courts, trying to get a hold of what the decree in 1935 said they couldn't do to start with. Thank you. We'll give you rebuttal time, so you don't need to worry about that. Thank you, Your Honor. Very gracious. Good morning. May it please the Court. John Smeltzer for the United States. Your Honor, as you know, there are a bunch of settling parties in this case who would like to address the Court. So I'm starting, and I'll try to be quick, but I'd like to answer any of the questions the Court has for the United States. It's okay to be quick, but don't be so quick that, you know, we're new to this. You're not. So take your time and make your points as far as I'm concerned. Thank you, Your Honor. Where I would like to focus my time is with the question of standing, because we think it's the most straightforward way to address the case. And the reason why this Court doesn't have jurisdiction is the absence of any injury to the tribe as a result of the settlement. The case law in this circuit is clear that standing principles apply to circumstances like this, where there's a partial settlement and an objection by a non-settling party. The case law in this circuit is also clear that a non-settling party must show some legal prejudice. You know, when I looked at those cases, it all had to do with there's litigation abounding, and some part of the party settled, and how about the ones that didn't settle? Can they challenge that settlement? I didn't find any case, though, as here, where there already is a consent decree, and the settlement is, at least allegedly, in derogation of the consent decree. So isn't that distinguishable from these other settling cases? Why isn't that a different situation? It's not different, Your Honor, because it's the same circumstance, in the sense that there's ongoing litigation and a complaint alleging that the current pumping is in derogation of the decree, and there's a disagreement among the parties, and then some of the parties have agreed to settle that dispute, and one of the parties has agreed not to, or actually two of the parties, the Apache tribe and the United States as trustees for the Apache tribe, has reserved its rights to raise any objections continuing under the pumping complaint. That's the other United States, right? It's the same United States, Your Honor. The United States has multiple claims under the pumping complaint, and obviously wears multiple hats in this adjudication. Do you have any case, though, you know, most of these cases, you think like a beginning trust case or whatever, and you've got hundreds of parties, and 95 of them settle out here, and it's not in derogation in any way to the five or the one that remains, but in those cases, there's no fixed res, like there is here. Do you have cases that involve something analogous to this situation? Right. Well, Your Honor, I'm not sure that this case actually involves a fixed res. I'm sorry. I'm not sure how to pronounce it, but the original globe equity decree was a decree that, or I'm sorry, was the complaint was a complaint against individual defendants, and one of the problems with the globe equity decree, as we point out in our brief, and as Mr. Sparks noted, is that the enforcement is limited against parties, because it's only the persons that are subject to the enforcement mechanisms of the decree are the parties to the decree. But once they do or don't, once they use or don't use the water in a certain way, there's only a fixed amount of it that they're related to, right? I mean, it's gone, for example. But the fundamental point in this case, Your Honor, is the Apache tribe has not been injured in any way with respect to its claims for use of the water of the Gila River, not by this settlement. Its claims haven't been hurt, but its use of the water has been hurt, right? I guess I'm having trouble seeing the difference between saying, I approve of you pumping four acre feet of water per year, as opposed to, well, I won't sue you if you pump four acre feet per year. It seems almost semantic. Well, why isn't that the case? Well, Judge, the United States and the Apache tribes have not agreed that we won't sue you. We won't sue the Upper Valley defendants or non-party appropriators for pumping in violation of Article 13 or any of the other articles of the decree. The United States has not agreed to that. The Apache tribe has not agreed to that. None of our rights to pursue the pumping complaint or to pursue the users of water that potentially are injuring or are depleting the river to the injury of the Apache tribe are immune from suit because we're still out there. What does still out there mean? What have you been doing since 2007? How have you been pursuing those rights? Well, as Mr. Sparks mentioned, there is severance and transfer provisions that are pursuing, and those severance and transfer could occur under the decree separate and apart from the settlement. It's, you know, standard circumstance where if somebody wants to use a decreed right in a different location, they can move for that. But there are certain severance and transfer motions that have occurred under the settlement, a bunch of them that are occurring, and the United States has joined the tribe in objecting to many of those, if not all of those. What do they get for settling with you? What does, I'm sorry? What does Grick and the others get in having a settlement with the United States? Well, there's an enormous amount to the overall settlement, and then there are various aspects of the individual settlement. Well, let's just take an individual pumper. Someone who doesn't have the decreed rights and is using it on different locations. One of each kind. First, we'll take the non-decree pumper. What do they get from the United States for being part of the settlement? The United States has agreed, along with the community, to forbear from enforcing the community's rights as against those individuals if the individuals comply with the terms and conditions that are set out in the forbearance agreement. The United States has not agreed. Are those different from Article 13, what Article 13 would allow? Well, Your Honor, the difficulty here is, of course, the underlying factual dispute as to whether the pumping is in violation of the decree has not been resolved. So what this settlement does. It hasn't been resolved technically, but, I mean, the district court says. It hasn't been resolved. Well, it's likely they're pumping. Most of them are pumping. And even in the Greek brief says, well, we meant by the impact zone, what we meant by that was the subflow of the Gila River. So it seems, especially in equity, it seems a little questionable to say, well, we don't know that these pumpers are pumping subflow. Is that just your technical position or do you agree? Your Honor, there are complicated issues for determining. Mr. Fines could probably address them better. He's on the side of the folks that don't believe they are pumping the subflow. But it hasn't been found, determined factually, and there's questions of return flow that play into whether it's actually subflow or waters that could have been appropriated or were appropriated properly to begin with. But in any event, those are concerns about potential injuries to the Upper Valley defendants for settling with the United States in circumstances where the United States and the tribe can still enforce those rights to the extent that we can prove in court that there are violations of the global equity decree and have a claim for injunctive right or injunctive relief in relation to that. I mean, that's not an injury for the tribe, right? I mean, if there's a problem here, it should be the people over in the Upper Valleys who are concerned with, well, you know, the United States settled on behalf of the community but not on the tribe and the United States can still go after us. Well, they're here supporting the settlement, Your Honor. And the issue here is whether the tribe suffers any injury from the settlement. And the point is that the case law, again, is clear. If you're a non-settling party, you have to show some injury to your own right. So your answer is not yet, and that's why I keep hearing the word right rebounding inside of my head. But nobody has said it's not right. You've characterized it as standing because no injury. Well, it's – you're saying we don't know yet whether the tribe is being damaged by all of this. Is that what you're saying? Well, no. The complaint alleges an injury, and they may proceed on that. But we can't ask this court for injunctive relief or the district court for injunctive relief or ask this court to assume that there is a basis for an injunction until we present our case, until we prevail, in which case then the scope of the injunctive relief and what needs to be done to protect the tribe's interest vis-a-vis the upper valley pumping will be determined. But it's – that hasn't been done yet. And the settlement in no way precludes us from moving forward to get that done. But is that really standing in the sense that if the tribe says, look, the way – if you take it as their characterization that what you have here is a modification of the decree to which they're a party, to which they didn't get to participate in that modification of the decree, and that by countenancing the status quo among certain users that, in fact, that is in derogation of their rights. Now, they may be right or wrong about that, but why isn't that enough to give Article III standing? Well, again, because, Your Honor, the decree does nothing to their rights, and it does nothing to the status quo. So where is the injury in the sense that – you keep saying the decree allows something to continue. Well, you know, not proceeding forward to enforce allows the status quo to remain. And the question isn't just enforcement of an injunction, but it's prosecution of a complaint that alleges a violation and then getting to the point of violation and then seeking the appropriate injunctive relief. So it's not simply – it's the – it was described as an agreement not to enforce. It's not really that. It's an agreement to forbear from certain claims on behalf of the settling parties, but not an agreement to forbear from the same claims on behalf of the tribe. And the tribe has those claims. The United States has those claims. Those claims can be brought. And all of that is going on as we sit here in this court. All of that may go on. Currently, in terms of the prosecution of the pumpkin complaint itself, there has not been particular action on that while this appeal has been pending. Because no jurisdiction to do so, or why not? It may be a jurisdictional issue, Your Honor. I don't know whether if the tribe actually – I can't help but wonder if you had the opportunity to enforce – if the tribe has had the opportunity to enforce its rights for the last two years. Why it hasn't. I mean, the water is going downstream.  Your Honor, it raises a whole host of questions that weren't specifically briefed about how the tribe is currently using water. Right. About how – what particular preliminary injunctive relief might be sought. And none of that – the tribe hasn't been prevented from any of that. And that's the question for this court. Is there any aspect to the settlement that prevents the tribe from pursuing its rights? Absolutely not. The door is wide open. All your rights are still there. Just come and talk to us. Not only does Judge Bolton say it. Every document in this case says it. Right. The Water Settlement Act says it. The Global Settlement says it. The Forbearance Agreement says it. The judge's order say it. And those were all specifically negotiated with the understanding of all the settling parties that the tribe's claims were not going to be settled away as part of this settlement. Well, let me go back to another question on jurisdiction. There's no final order here. We know that. Yes, Your Honor. So if we were to accept jurisdiction as suggested in your footnote under 1292, that this is at least alleged to be a functional modification, et cetera. Yes, Your Honor. If that were the basis for accepting jurisdiction, then we would have to determine what we would then have jurisdiction to determine whether, in fact, there were a functional modification, correct? Yes. How can we determine that on this record? Well, I think the standing question would actually precede the issue of, you know, is it a change? And the standing issue precedes it, of course, because Article III standing issues always come first. But the record is clear that the decree itself has not been changed in any way vis-à-vis the tribe. There's no question that the tribe can enforce every aspect of the decree. The settling parties themselves agreed not to modify the decree terms, which are a base, a framework for then allowing this forbearance agreement to go forward. What that actually is in terms of, you know, a functional modification or a change in relationship between the parties, obviously the parties intended the settlement to mean something between them in terms of when and where decree rights can be enforced. But that's completely separate from the issue as to whether it impairs in any way the tribe's decree rights and the rights that the United States holds on behalf of the tribe. And that is the threshold fundamental question. And that is, honestly, very clear on the record. The tribe in its brief admits that they can proceed, and I believe admitted here at argument, that they may proceed in furtherance of any of their decree rights in district court. Let me ask you about what the district court did. And one of the things that really troubles me about this case, we've said that a district court is responsible for enforcing consent decrees, not merely the parties. And so can the district court, is it appropriate for the district court to approve the settlement agreement, which is blessing at least what the district court thought was likely pumping in derogation of the consent decree? Was that appropriate? Was that an abuse of discretion? It was appropriate, Your Honor, because it was not to the injury of anyone's rights, and anyone was allowed to object to that process. I don't understand that. I mean, how could approving other non-decreed parties taking decreed water not be in derogation of the rights of the parties to the consent decree? The premise of the question is wrong, Your Honor. The decree or the settlement doesn't permit non-parties to the decree to take decreed water. Again, there's a factual dispute as to whether they are and whether they're not. Well, the district court said it likely was. It likely was decreed water is what the district court found. And any parties to the decree that didn't sign on to that settlement or who don't sign on to that settlement may continue to enforce their decree rights against any of those persons, whether it has to occur in state court or whether it occurs in federal district court is a thorny issue for many of the reasons that Mr. Sparks raised. But those issues have nothing to do with this. The settlement didn't make that any more or less of a problem, the problem of how you take a decree that's a decree between a defined group of parties and then apply that against non-parties who have appropriated water in the state of Arizona. And that's a complex issue that is being worked out in the state court proceedings. And those are going forward. But the settlement didn't change anything in relation to that. But if the community gives up certain rights but, in fact, the persons against whom they're giving up these certain rights are pumping in violation of the decree, then the United States will back the community on that or no? Well, the United States is backing the community in the settlement. And as a part of the settlement, the community has agreed to forbear for bringing certain claims. And where the community has agreed to forbear, the United States has also agreed to forbear where the conditions have not been met and the community can't enforce its rights against the adjudicator. Right. So if there were a case where somebody were pumping in violation of the decree, the community forbears, so that person is off the hook at least vis-a-vis the community. But the United States also forbears, which means the United States won't go forward and enforce the rights or no? No. It doesn't mean that at all. So if it's under the decree, so the United States has a split personality on that point where it would go back under the decree and reserve its rights to enforce? The way the court should look at it is the United States had multiple claims itself as plaintiff in the pumping complaint. The United States decided to resolve some of its claims, not all of its claims. The claims the United States did not resolve were any claims that it may bring as trustee on behalf of the Apache tribe for enforcement of the globe equity rights, for claiming any additional rights, for any appropriate remedy for violation of that right. But the United States had the authority initially as trustee for the community and others to also pursue their rights, correct? That's correct, Your Honor. But you've now given up those rights? Your Honor, we've given up those rights in a complex settlement where the Congress and all the parties to the settlement have agreed that it's in the public interest and in the interest of the water users in the state of Arizona. It was not a simple process. And we're not shying away from that agreement. It's a good agreement for the community. And the United States as trustee for the community, of course, looks to the sovereignty of the community in terms of its decision making and what it decides is good for the community. The United States did not give up any rights on behalf of the tribe. You couldn't have. You would have been prohibited from doing that. You couldn't have sold out the tribe on behalf of the community. That's true, Your Honor, but we didn't. And that's where we're standing here. We're standing here in support of the settlement because it doesn't injure the tribe, and we want the court to know that the tribe is not injured and has no standing to object to the settlement, and the United States will be a partner to the tribe when we go back to the district court. And I've taken way too much of my time. All right. We'll hear from whoever is next. For my part, you haven't. I thank you for your illumination. Your Honor, with the permission of the other counsel, my name is Anthony Fines. I'm not in order, but there have been some factual questions that I think I can address. I'm the only lawyer in the courtroom who also participated in the trial bill, so I can answer some of the questions. The first thing that I think that you have, there's an inaccurate premise to some of your questions, and the inaccurate premise is that the pumping by the members of my irrigation district violates the decree. There was a motion for summary judgment on that issue. The judge denied the motion for summary judgment, saying there's mixed questions of facts and law, and that's in the Apache Excellence of Record of 1549. So that's pending, genuine issues. Right. And what specifically was that issue? Again, I'm looking at the community's brief, their footnote, which said, the creation of the UV impact zone is only for purposes of delineating where the parties to the agreement agree the subflow of the Gila River is for purposes of carrying out the terms of the agreement. What we tried to do in the settlement, which I helped negotiate, was define boundaries of where the settlement would apply, and that's the impact zone, which I'm sure if this gets litigated below, Mr. Sparks will say the impact zone or the subflow zone is, in fact, broader than that. In fact, he's taken that position in other courts. We just had to have a boundary where we could draw lines on the map and say the settlement applies within this boundary, and that's why the impact zone is there. So Mr. Sparks would say that the subflow is larger, but it seems like the parties have agreed that at least within these boundaries there's subflow. So the pumping from that area, at least, would be in variegation of the decree. Is that right? Once again, all the parties moved against my plan for summary judgment saying state law controls, and this was all in violation of the decree. They moved for summary judgment twice. One time Judge Kuhnhauer judged before Judge Bolton just denied it. Then he had a trial, and then he recused himself. They moved for summary judgment again. Judge Bolton denied it, said there was questions of access to each well that had to be determined. Those were wells in the impact zone. Before or after the Arizona Supreme Court ruled? After. It was after that. And so the Arizona Supreme Court said this is easy, readily identifiable, DWR, some of the work's already been done, DWR should go out and delineate. Has DWR gone out and delineated, or what's happening with that? No, what the Arizona Supreme Court did is they looked at the San Pedro River, and they said after the San Pedro River it's pretty easy to determine, not easy, because they haven't done it yet, but they said this is how you determine what the subflow is. And then they said that ruling should apply to the Gila River. The Arizona Supreme Court had already said other rivers may be different, but they said this should apply to the Gila River. One of my defenses was that there's unique provisions in the Globe Equity Decree which would allow us to pump notwithstanding whether it's subflow or not subflow. It was as to those issues that Judge Bolton said, those are mixed questions of fact and law, and I'm not going to decide them. So right now there's no decision at all. And what was going on then when that motion for summary judgment was being litigated, there were four major parties against my group of clients, and then not really my group of clients but the members of my irrigation districts. And then when we settled, three dropped out. The main one, the Apache tribe, they stayed. They stayed with exactly the same issues. And that's the only difference. Three people decided not to pursue the litigation, but one dropped out. Where we're left right now, according to you, is that nobody knows one way or the other because there's still factual questions about whether members within your district are pumping in accord or not in accord with the decree. We don't know that yet. We don't know that. But with respect to standing, the tribe alleges that they're pumping outside the decree. Why wouldn't that give them standing? I mean, not that they have to win on that point, but why wouldn't that give them standing if, in fact, they make that claim? Because there's nothing that happened below that hurts them. As I said, there was four major parties litigating against my clients, and now three have said we're going to stay home, we're not going to litigate that anymore. And they have the same rights they had the day before, except that they don't have four lawyers at the council table. They just have one lawyer at the council table. So that's the difference. If we terminate this appeal on the ground that there's no jurisdiction or no standing, or if we affirm the district court, tell us, in your view, what then happens in the district court. I think eventually, and Mr. Sparks is right, he's a two-person law firm, I'm a one-person law firm, and we have all these applications that are pending for transferring water rights. There's only so much we can do. And the judge is setting, I think, a fairly aggressive schedule on getting that done. So I think as those things work out, these issues, if we don't settle somehow, will eventually be brought to court and litigated in front of Judge Bolton. Those issues being exactly what? What do you mean? Pumping issues. Pumping issues. And what makes it so much more complicated. Percolating, subflow, all the rest. Right. And there's two complicating factors. They moved to have my client be class representative. Judge Kuhnhauer said, no, every well is unique. You have to sue the people individually. So in order to just logistically get, and he said 1,700 wells. I think it's less than that. Just logistically to get that to the court and get it done is going to be difficult, and we're tied up with the applications for transfer right now. Your clients don't have any free, they don't have any safe harbor from pumping as to the status of their pumping because they still have the San Carlos tribe challenging them. Right. And there's another thing. So what do they get out of the settlement then? What they get out of the settlement, and sometimes they ask you that, but what they get out of the settlement is they have, like I say, three out of the four parties are not suing them anymore, and maybe that will make it easier. Maybe they'll be able to resolve it with the fourth one, or maybe we have other defenses which we might be able to apply to them. Well, is the answer to whether they're pumping illegally or not the same vis-a-vis San Carlos as it is the other? I think whether it's legal or not legal is going to be the same. As to whether they're going to be injured by our pumping or not injured by our pumping may be different. Let me ask you about the severance and transfer of water rights. Now, are your clients determining that they're pumping Gila River before they sever and transfer the water rights, or are they just getting water rights that they don't actually need or they don't know? I'm glad you asked that question because it raises two issues which I think we should be aware of. The globe equity decree is a limited decree. It's not a comprehensive decree on the whole of Gila River. It applies to certain lands in the upper Gila River. Some of the wells are irrigating lands that are adjacent to the lands that have rights under the decree that are not maimed in the decree. And originally, the federal parties, and by that I mean the United States and the two tribes in the San Carlos Irrigation and Drainage District sued everybody, the ones who were subject to the decree and the ones that have lands that are adjacent to the land that are subject to the decree, sometimes the same people, because this is a quasi, really a quasi interim case. And what Judge Kuhnhauer said, he said, I'm dismissing without prejudice as to the non-decreed lands that are adjacent. And those might have to be litigated in state court, as Mr. Sparks said. And then Mr. Sparks said, well, that's a real difficult issue, and he asked for 54B language. And Judge Kuhnhauer said, no, I'm not going to give you 54B language on that. So that issue has not been resolved. The issue as to whether those adjacent- Did he ask for 54B language from Judge Bolton? No, this was from Judge Kuhnhauer. Right, and that was before. Yeah, and that issue was just left there. When Judge Kuhnhauer said no 54B language as to whether the adjacent land should be subject to the federal court or have to go to state court, he said, and it's like lots of decisions which judges don't set up on appeal, it's a very short decision, then he said no 54B language. So we don't know. When Mr. Sparks says it has to go to state court, we don't know because there's no 54B language there. What's the independent role of the water commissioner? It says here the water commissioner, in his administration of the decree, has the authority and responsibility to ensure that illegal diversions are not being made from the Gila River, and if they are, to bring them out of the court's attention. If it's not voluntary, stopped upon discovery. How does the water commissioner function in this situation? The question was, oh, about 30 years ago was the first time this issue came up. The United States asked the then water commissioner to stop what they perceived to be illegal pumping. Judge Walsh issued an order saying if you want to do that, my water commissioner is not going to do it. You're going to have to give notice to the individual pumpers. And that's, once again, non 54B language, a very short decision by Judge Walsh, but that's what followed since then. That's what Judge Kunauer followed and said you have to give individual notice and serve people individually, and I'm not going to have the water commissioner do that until I, the judge, decides whether this is illegal or not illegal. And that's been the ruling of the law in this case for 30 years. But the judge decides that, not the water commissioner. So the only thing the water commissioner can do is bring it to the court's attention? The water commissioner can, yeah, but it's to the court's attention. There's been a complaint filed. People have been served. There's been some litigation on it. The court knows about the issue. It's not up to the water commissioner to do it. And the water commissioner's position is, I'm sure, I mean the order isn't here, but his position has always been this is before the court, now the judge is going to decide and I'll do whatever the judge tells me to do. Judge, you asked one question before and I never got the answer completely, and it's about these transfers. What has happened is, for various reasons, sometimes there's a flood and lands get taken out of production. There are modern farming techniques. There's a farm that used to be here to move over a little bit. So now the farm is also farming lands that aren't decreed. And the decree contains a provision that you can transfer your decreed rights from an area where it's not being used to an area where it is being used, subject to various criteria. And like everything in this case, we thought that would be simple and it's like a world war. You know, everyone's litigating about it and that's what we're doing right now. So I really came here in case there was questions about this. If you have any other questions about the history of how we got here and what's going on, I can answer them. Thank you. Thank you. Your Honor, may it please the Court, Jennifer Giff representing the Gila River Indian Community. I'll be extremely brief. Thank you for your generosity and time. The community settlement is extremely comprehensive. However, what is reviewed before this Court today is really the UB forbearance agreement. What really hasn't been stated to date is that the community did reach an agreement with all the parties, with the settling parties. But what is also in the agreement is that it does not in any way modify the globe equity decree. Indeed, the community wants to ensure that decree is maintained and this is in compliance with the decree in terms that if for some reason the people on this side of the table no longer agree and want to go on the other side of the table, we'll be over there too because our rights under the globe equity decree, we can enforce and protect them. So wouldn't the Court have to enforce the forbearance agreement, which is approved now, so that if somebody came, if your client decided we don't like this deal that these people, these upper valley farmers are pumping water that's clearly subflow and you come into court to try to enforce it, wouldn't the district court then have to figure out whether it's going to enforce the globe equity decree or your forbearance agreement that's now also approved? How would that work? Well, the court would look at if we came and determined that there was an issue with the forbearance agreement in terms that it wasn't operating as we had agreed to, we could ask the court then to dissolve that forbearance agreement but the community's globe equity rights would still remain intact, and they still are intact right now, as are the San Carlos Apache tribes. As a non-signatory to that forbearance agreement, the Apache tribe has every right under the globe equity decree, can enforce that decree, can enforce its rights under that decree, and can actually use the information obtained through the settlement technical committee, through the provisions in the forbearance agreement, all that information to bring, to reassert the pumping complaint as mentioned before. What does this section 412 of the forbearance agreement really mean? It basically says subject to this agreement, in effect, your client as a signatory reserves rights to assert claims under the globe equity decree. So what is it in the forbearance agreement that is, quote, subject to the agreement that would trigger your right to, you know, quit forbearing and then move into enforcement? What has to happen? There's, under the provisions of the forbearance agreement, there's a desire to understand where the wells are, to put measuring in, to have the settlement technical committee look at the technical aspects of enforcing it, to determining where the wells are, to putting meters on the wells, to measuring those wells, to looking at a reduction in acreage, to looking at additional terms of getting information. If the parties aren't in agreement to how that is going to be done or the parties don't offer that information as it's stated in the agreement, then the agreement doesn't seem to work, would not seem to work, and then we would ask the court to, I guess, to not approve it anymore and then to maintain our globe equity decree rights. But basically this is intertwined with the globe equity decree throughout, correct? The globe equity decree is our rights. Well, as to rights under the globe equity decree, what you have and what you give up, the two have to be read together, correct? Well, yes, because there's nothing in the forbearance agreement that modifies the globe equity decree. That's stated both in the agreement itself and it's stated through the congressionally approved process that the community went through. And, Tom, Your Honor, I think the case is very simple. It's the community. Very simple? Go ahead. The community stands here with a congressionally approved water settlement. It's extremely comprehensive. What, again, is before the court is redoing of the partial settlement of the community's pumping complaint using the forbearance agreement to settle that complaint. And with that, we ask the court to deny the Apache Tribes' appeal. All right. Is anyone else going to argue for the affidavit? Your Honor, Cynthia Chandley, on behalf of three-court background counsel. I just wanted to make a couple of quick points for you. You've asked a couple of times, Your Honor, specifically whether or not this case is right. And in our briefs, we've made these arguments on jurisdiction. There's two ways you have jurisdiction. One, is there a final judgment? And the answer here is no. There's no final judgment before you that applies to the San Carlos Apache Tribe that you could take jurisdiction on. So 1291 goes out. So 1291 goes out. Correct, Your Honor. The other way that it's been shown to you is perhaps under 1292A1 that there's jurisdiction because an injunction has been modified or has – I think the United States might have said that the court has refused to modify the injunction. No one has requested that an injunction be modified. So that hasn't happened either. Now, the San Carlos Apache Tribe has alleged that this settlement modifies the injunction, the decree itself. But the court has said that it does not. The district court. That's a community thing. I mean, that's – you know what they – the district court basically signed off on the stipulation, right? Right, right. Let me get back to that. But it is expressed in the agreement that it should not. So the interpretation of the agreement should be that it does not. And the legislation that approved the overall settlement said that it could not modify the decree. So it was none of the party's intentions to do that. And certainly we'll see if it does or not. The freestanding litigation that this arises out of is the pumping complaint. And that pumping complaint can be brought by the San Carlos Apache Tribe. Now, I understand Mr. Sparks is a one-man shop and they have some challenges. But I don't believe there's anything legally barring them from bringing it if they have the time to do it, given all the applications that are going on. Once they bring that freestanding pumping complaint, we can litigate that to its conclusion. Then there will be a judgment that if they don't like it, they can appeal from. But at this point in time, I don't think you have a final judgment or an amendment or a revision of a ---- You don't need an amendment to have jurisdiction to consider whether you have an amendment, though. If somebody claims that something is tantamount to an amendment, we would have jurisdiction to then consider that, wouldn't we? Yes. Yes. You have jurisdiction. We do have jurisdiction under that theory. If you agree that it has actually been changed, that there has been some ---- In other words, you have to win in order to get jurisdiction. Is that your position? I mean, not you, but the party making the allegation. I don't like arguing it that way, Your Honor, but when you put it that way, I think I have to answer yes. All right. Thank you. Thank you. Thank you. You have five minutes for rebuttal. First of all, Your Honors, thank you on behalf of all the party for your patience and your interest in the case. We're very grateful. I'm also very honored to appear before this particular panel, given the length of my career and the opportunity to see you. I want to provide the Court with three fundamentals that are, I think, go right to the heart of this. First of all, the decree is the decree is the decree. Parties to the decree don't unilaterally have the right to agree among themselves not to enforce a decree of a federal district court. Secondly, Congress did not approve and agree a settlement that would violate the decree because it would violate Article III to do that. It said, in fact, that the Secretary was only authorized to sign something which did not affect or effect the rights of the San Carlos Apache Tribe. Now, the decree itself sets out exactly who can pump and where and how much. And it sets out exactly who can't. And it sets out exactly left, right side of the river by canal, by pump, by canal or river pump, and by the subflows of the Gila River. Article VIII, for instance, the predecessor to ASARCO, a mining company, Kennecott, and before that, I believe it was Arizona Copper Company, gets to pump by the decree from the underground waters of the Gila River. It's specifically set forth. The decree then enjoins everything else. Well, let me go back to your second point. You said Congress didn't approve a settlement that violated the decree and they couldn't do that. I think that everybody on this side of the table would actually agree with that. I don't want to put words in their mouths, but they would say, yeah, that's right. They didn't – this settlement did not violate the decree. And therefore, since it didn't violate the decree, sort of no harm, no foul. I'm saying, Your Honor, that the settlement did in fact violate the decree because the Secretary did not in fact change those provisions as required by Congress that would free the San Carlos Apache Tribe from the harms and effects against its rights. It failed to do that. Therefore, it violates the decree expressly. What happens if the community decides it's not going to enforce its rights? How does that harm San Carlos? Well, the interesting part of it is that it has retained the right to enforce it against San Carlos Apache, and it has the first 435.7 cubic feet per second out of the river each year, and therefore when the river's running by and San Carlos Apache's crops are burning up, the tribe has to watch the water run by while its crops wither and fail. So when it doesn't – when it, the Gila River Indian Community or the United States, does not enforce the decree against others in the safe harbors, on the San Pedro, and other locations, including, Your Honor, above the Coolidge Dam, it is then choosing to enforce it against only one, San Carlos Apache. And if those waters were being enforced, and if they were flowing to the Gila River Indian Community, there would be far fewer days when the tribe would have to watch that water flow by at an immemorial water right when the San Carlos Apache Tribe's right is 1846 and watch its crops die, which happens now. And the other thing is, I want to address the harm. Do they have any obligation under the flow of equity decree to enforce? They cannot choose against whom to enforce the decree. Do they have any obligation to enforce at all? They have no obligation. Let's say they build a, I don't know, some kind of a space station, and they say we don't want any water anymore, so we're not going to enforce the decree. We're just done. Let it go. No, they don't have any. They have no obligation to enforce it. Let me just ask, if they have no obligation to enforce under the decree, then simply saying, and guess what, I'm not going to, what's the difference? The difference is the United States can't say that. The United States has to protect the trust assets of the Gila River Indian Community except here where it's agreed not to. And so the United States does. I don't follow that. If they don't have to enforce, they tell the United States we don't want it enforced. The United States has to tell the U.S. to enforce it whether you want to or not? The United States has a trust obligation that exceeds the request and decisions and preferences of the tribe. There are a number of cases that have unfortunately said that, including the Truckee River cases, U.S. versus Nevada. I'm still at a bit of a loss, though, if the tribe says we don't want to enforce. You're telling us the United States somehow has the obligation to force the tribe to enforce. No, the obligation, the United States has no obligation to force the tribe to enforce it. It has the obligation to enforce itself as trustee on behalf of the tribe, of the community. But isn't his role as trustee, isn't that in relation to the tribe and the tribe's goals? Tribes in what? The tribe's goals and the tribe's circumstances. I mean, it's not an abstract. We state the U.S. role as trustee in the abstract, but to actually put it into action, it doesn't do that without looking at the circumstances of the tribe that it's actually acting for, does it? No, I think it would be irresponsible for the United States to look at other than the circumstances before it acted. However, the United States is expressly the holder of the water rights of the Gila River Indian community under the decree and of the Gila River Indian community allottees, their individual property rights under the decree, and for the San Carlos irrigation projects under the decree. It is the owner. It has the duty. And the court, in guarding its own jurisdiction, has a substantive duty and retained that duty under the jurisdiction of Article 13 to enforce the decree. But I would like now to address a specific set of harms. One other thing, and that is I think it's puzzling to the court as to what Gila River gets out of this by refraining, and the United States refraining from enforcement. What it gets is hundreds of thousands of acre feet of other water downstream at its canals out of the Central Arizona project, out of the Salt River project, out of the Roosevelt Water Conservation District, to make up for the water that is being taken in violation of the decree upstream of the San Carlos Apache tribe. So it's held harmless from its refrain from enforcement. And then the Upper Valleys can violate the decree, take more water than is allowed under the decree. Looking at each of the exhibits for Safford, Duncan, Verdon, Phelps Dodge, and the Upper Valley Forbearance Agreement, you'll see that they can mitigate by just simply paying the Gila River Indian community for its water, its CAP water, or providing other water downstream to it. We have a minute and a half left if you wanted to address the final harm. Okay. I just wanted one observation on that. They can do that to the extent that it doesn't affect the rights of the tribe. That's what the court said. That's what the court's order said. Well, Your Honor, they can do that as far as all the parties to the decree are concerned except for the Apache tribes. So far as it doesn't affect a single right of the tribe. Well, Your Honor, that's where partying company is not the right term here. But, anyway, that's where I would like to point to 920F sub 14, which is one of our Judge Kuhnel, not to be found as a sophomore in anyone's mind who's practiced for 20 years before him, found that poking, in fact, adversely affects the water rights of the San Carlos Apache tribe. It depletes the flow, it degrades the quality, and the court entered an injunction to provide the tribe with water, which was capable of sustaining the crops of moderately salt-sensitive propensities as it had in traditional times. That injunction has never been able to be achieved. If the court were to take judicial notice of the district court's commissioner's website, which is published every day on the internet, as all gods like me say, interweb, you'll find that yesterday, the average salinity for the entire year at San Carlos was almost 5,000 decisiemens per liter, which is an element of conductivity. It's not parts per billion of salt, but it's so salt it's nearly seawater. To put it on the crops would kill it. It's not thick enough to cut. It's not thin enough to grow water crops with. It won't grow things there. So the water quality injunction, this Upper Valley Forbearance Agreement violates that. It violates, and what I'm pointing out is we don't have to guess. This court doesn't have to guess whether that pumping violates the decree. Your time has well expired now. We've given you quite a few more minutes than I said to enlist. The panel has additional questions I'm going to ask you. This will be the close of your argument, the close of everyone's argument here. The case just argued is submitted. We appreciate the briefs. They're quite comprehensive from everyone and very careful. And with that, the court is adjourned. Thank you. Thank you.
judges: Trott, McKeown, Ikuta